# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 28, 2010

## STATE OF TENNESSEE v. JAMAR McFIELD

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 266423      Don W. Poole, Judge**

---

**No. E2009-02472-CCA-R3-CD - Filed June 27, 2011**

---

The Defendant-Appellant, Jamar McField, was convicted by a Hamilton County jury of first degree felony murder and aggravated child abuse. He received a life sentence with the possibility of parole for felony murder and a concurrent sentence of twenty years for aggravated child abuse.[1] On appeal, McField claims: (1) the trial court erred in denying his motion to suppress; (2) the insufficiency of the evidence; (3) the trial court improperly ruled that an autopsy photograph was admissible; and (4) the trial court misapplied an enhancement factor during sentencing. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Hilary Hodgkins, Chattanooga, Tennessee, for the Defendant-Appellant, Jamar McField.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William H. Cox, III, District Attorney General; and Leslie Longshore, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case involves the death of four-year-old Keanon Beamon, the victim, who died as a result of multiple blunt force injuries to his head, chest, and abdomen. It is undisputed that on the day the victim died, McField, the boyfriend of the victim's mother, was the

---

[1]The judgment form for aggravated child abuse does not state that the sentence is concurrent to the life sentence for felony murder. The trial court made this finding at the sentencing hearing. The judgment form should be corrected to reflect the imposition of concurrent sentencing.

victim's sole caretaker. In an effort to explain what happened to the victim, McField provided two statements to the police, which he later moved to suppress.

**Suppression Hearing**. As an initial matter, the motion to suppress is not included in the record. The following testimony was presented at the suppression hearing.

Detective Josh Meyer of the Chattanooga Police Department testified that he was assigned to the Major Investigations, Child Abuse Unit. On the day of the offense, he received a phone call regarding the victim, Keanon Beamon,[2] age four. The victim had reportedly stopped breathing and was receiving cardiopulmonary resuscitation (CPR). Detective Meyer immediately contacted Detective Mike Tilley of the Major Crimes, Homicide Unit. Detective Tilley requested that Detective Meyer have the victim's parents brought to the police service center. Detective Meyer explained that the parents were needed as part of the "fact-finding investigation."

Detective Meyer testified that the victim's mother, Karen Railey, and her boyfriend, McField, were brought to the police service center. McField is not the victim's biological father. Detective Meyer said he interviewed McField and Railey together in a conference room. He described the conference room as follows: "It is downstairs in the Major Investigations office but it's to the rear of the building. It's just a big conference room, big conference table, chairs, TV." During the interview, Detective Meyer was "just asking questions, you know, what time did you go to work, tell me what you did today and trying to determine who was where and who all was present." Detective Meyer stopped the interview and told McField and Railey that they could watch television. He stated that during the interview, he was able to obtain consent to search the home. Detective Meyer acknowledged that he never informed McField and Railey of their Miranda rights. He explained, "I had no reason to. I was just there to try to determine what was going on, what happened to the child." Detective Meyer could not recall how long the interview lasted. At the time of the interview, he did not know whether the victim was dead or whether a crime had been committed. Detective Meyer was the only officer present during the interview, and he was unarmed. Detective Meyer had McField and Railey brought to the police service center by a patrol unit. The interview was recorded and introduced as an exhibit at the suppression hearing and at trial.

On cross-examination, Detective Meyer could not recall when the interview began. McField and Railey were not told that they were free to go to the hospital to check on the victim. Detective Meyer stated that "if they had asked, I would have let them." Detective Meyer was unsure if McField stayed at the police service center after the interview. McField

---

[2]For purposes of clarity, we will refer to Keanon Beamon as the victim. His sisters will be referred to by their first names. No disrespect is intended to these individuals.

was interviewed later that evening by Detective Tilley. Detective Meyer testified that during the initial interview with McField, he learned that McField had been left alone to care for the victim. Detective Meyer was also told that McField had disciplined the victim by "whopping him on the behind."

Detective Mike Tilley of the Chattanooga Police Department testified that he was assigned to the Homicide Unit. At around 5:30 p.m. on the day of the offense, he received a phone call and was informed that the victim had been transported to a hospital. Detective Tilley said he went to the hospital to check on the victim's condition. The victim was pronounced dead at 5:58 p.m. Detective Tilley testified that he made several phone calls while at the hospital. He had Detective Meyer obtain a signed consent form from McField and Railey. Additionally, Detective Tilley had Detective Meyer question them about what might have caused the victim's death. Detective Tilley stated that at that time, "There was nothing external that they saw that would indicate any type of cause of death. They didn't have time to do any X-rays or scans or anything because they . . . just concentrated their efforts on resuscitation at that time." Detective Tilley said it was determined that an autopsy was needed. Detective Tilley left the hospital at 6:50 p.m., and went to the scene of the offense. He stayed there for less than thirty minutes before going to the police service center to begin the interviews.

Detective Tilley testified that he interviewed McField after returning to the police service center. Detective Meyer was also present for this interview. At the outset, Detective Tilley advised McField of his Miranda rights orally and in writing. The written waiver was introduced as an exhibit. Detective Tilley testified that the interview was recorded and lasted around forty-five minutes. Detective Tilley said he tried to ascertain the cause of the victim's death. At the time of the interview, he knew that the victim was dead, but he was unsure if the case was a homicide. Detective Tilley "[v]aguely" recalled McField asking to leave. He stated, "I believe I responded that he could leave." Detective Tilley said McField was allowed to leave after the interview. McField was arrested two days later.

On cross-examination, Detective Tilley estimated that he interviewed McField three hours after the initial interview with Detective Meyer. McField remained at the police service center during the intervening period. By the time of the second interview, McField was aware that the victim had died. Detective Tilley said he did not tell McField that he was free to leave the police service center. McField was not given anything to eat. Detective Tilley recalled McField stating that he was literate and had an eighth-grade education. He was unsure if McField had prior dealings with law enforcement.

McField testified that he felt obligated to go with the officers to the police service center. He also thought he was required to stay at the police service center during the

interview process. On cross-examination, McField acknowledged that he never made a request to leave the police service center to go to the hospital.

The trial court denied the motion to suppress. Its written order is not included in the record. However, the transcript from the suppression hearing contains a detailed account of the trial court's findings. The trial court determined that McField's initial statement to Detective Meyer was admissible despite the absence of Miranda warnings. It reasoned that the initial interview was a non-custodial interrogation. The trial court stated:

A reasonable person in the position of Mr. McField, I find, would be free to leave. Certainly, based upon everything that was heard, the audio, the testimony, he was free to leave, it simply was a statement to find out what had happened to this child, who was with the child.

Several factors in the Anderson case are important. This is not inclusive. Time and location of interrogation; it was in a conference room, it was not a regular detective office or interview room. Conference room.

The duration and care to the questioning; as indicated, it was a give-and-take, it was not accusatory, it was of short duration, approximately eight and a half minutes.

The tone of voice, general demeanor; I think it was even admitted by the defendant that this officer is a friendly officer, and that was the way the interview was carried on. It was a friendly conversation, as best it could be with the facts and circumstances, but certainly . . . it was not accusatory in any way.

He was transported by an officer to a place of questioning. There was one officer present, he was not armed. There was no limitation on movement that the Court finds, based upon the testimony that I've heard.

The interactions between Mr. McField and the one officer were good. There was, as indicated, nothing accusatory. The officer basically indicated what happened [that] day, who was with the child, these were the words spoken. The suspect, Mr. McField in this situation, his verbal responses were good as to what was going on, he was not confronted as [to] whether there was any suspicion he had harmed this child in any way. And I find, based upon all the circumstances, that this was a non-custodial statement.

-4-

The trial court then addressed McField's later statement to Detective Tilley. It found that McField freely and voluntarily waived his <u>Miranda</u> rights before making this statement. The trial court stated:

> Even though this defendant had an eighth grade education, very clear from the answers that he gave to Officer Tilley that he very much understood what was going on and he voluntarily and freely talked to this detective about what had gone on with he and the child all through the day. All the facts and circumstances would indicate that this was a free and voluntary act. There was no indication he was deprived of food, there was no indication that there was any drug or alcohol problems which would render the statement nonvoluntary. There's no indication at all he requested an attorney, requested to leave.

**Trial**. Nine-year-old Karimyaha Railey, the victim's sister, testified that on the day that her brother died she gave him a hug and left for school. When she returned home, the victim was lying naked on her mother's bed under the covers. Karimyaha stated that "he wasn't breathing, he wasn't moving, he was just still." She also described the victim as being cold. Karimyaha testified that McField was at the home, and he told her that the victim was dead. According to Karimyaha, McField gave the following explanation for what had happened:

> Well, he said Keanon had peed in the bed, he woke up, he gave him a spanking with his hand and he ran him some bath water and he told him to go ahead and take a bath and Keanon was just splashing water on himself and so he asked him was he done, he said yes or yes, sir, and when he went to get out the tub, he said he flipped over the tub, he either hit his face or his stomach and he asked him if he was okay and he said yes.

Chris Gaynor, with the Hamilton County 911 District, testified that his office received an emergency phone call from McField on the day of the offense. This phone call was recorded, entered as an exhibit, and played for the jury. During the phone call, McField states that the victim is dead and had stopped breathing thirty minutes before the 911 call. McField added that the victim was breathing at some point, but then stopped.

Officer Zach Fuller of the Chattanooga Police Department testified that he responded to an emergency call from the victim's home. When he arrived at the scene, the medical unit was already performing CPR on the victim. Officer Fuller stated, "[McField] told me that around 4:30 to 4:45 on that same day, that the child was taking a bath and had fallen out of the tub and stopped breathing right after falling out of the tub." McField also said the victim had stopped breathing fifteen to thirty minutes before McField called for help.

Dr. Bernard Patrick Connell, a pediatric physician at a children's hospital, testified that the victim was brought to the emergency room, and they unsuccessfully attempted to resuscitate him.

Leeh Butcher, a paramedic for the Hamilton County Emergency Medical Services, testified that she went to the victim's home in response to a 911 call. She said the fire department personnel had already arrived and were performing CPR on the victim. The victim's heart was not beating, and there were no obvious signs of trauma. Butcher approximated that the 911 call was made at 5:00.

Karen Railey, the victim's mother, testified that at the time of the offense, she was in a relationship with McField. They were living together in an apartment. Railey said she had three children: the victim, age four, Karimyaha, age seven, and Ka'Reysha, age one.

Railey testified that, on the date of the offense, she left for work between 6:30 and 6:42 a.m. Her children remained at the apartment with McField and McField's sister, Laquita Chambers. Railey said she interacted with the victim before she left for work. Railey worked a full day and returned home at around 5:00 p.m. She was told by Karimyaha that the victim was dead. The victim was lying naked on her bed. His body was cold, his eyes were halfway open, and "liquid stuff fell out his nose." Railey then told McField to call 911.

Railey testified that the victim and Ka'Reysha typically went to a daycare on weekdays. They stayed at home on the day of the offense because the victim's eyes were irritated. Railey said "the daycare wasn't sure if it was pinkeye, so I couldn't take him back until I got him checked." McField was responsible for taking care of the victim and Ka'Reysha during the day. She stated, "When I worked, he kept them, made sure they went to daycare and to school. My oldest daughter goes to school and he would make sure she would get off to school and my two little ones, he would make sure they get to daycare." Railey said the victim struggled with potty-training, and he frequently wet himself.

Railey testified that an ambulance took the victim to the hospital. She did not go to the hospital and explained, "They made us stay on site at the house until the police officers took us to the station." An hour later, she was told that the victim was dead. Railey never asked McField what had happened to the victim. She stated, "I was more or less in shock." Railey said the victim did not have medical or behavioral problems. She stated that the victim had been punished in the past for intentionally peeing on himself. His punishment was a spanking. Railey testified that McField left a voice message on her phone after the victim's death. This message was played for jury. In the message, McField repeatedly apologized for what had occurred. He told Railey that he loved the victim.

On cross-examination, Railey testified that she was in a relationship with McField for around one year. She never saw McField lose his temper with her children. Additionally, Railey never saw McField physically harm her children. Railey denied telling the police that she arrived home from work at 4:00 p.m. She also denied testifying at the preliminary hearing that she arrived home at 4:50 to 4:55 p.m. Railey stated that in the past, McField had taken care of her children while she was at work. Although her daughter suffered from a seizure disorder, Railey said the victim did not. Railey testified that McField's sister, Laquita Chambers, also stayed at the apartment.

Detective Josh Meyer of the Chattanooga Police Department testified that he was assigned to the Child Abuse Unit. On the day of the offense at approximately 5:30 p.m., he received a phone call regarding the victim, who was receiving CPR. Detective Meyer ordered the victim's parents to be brought to the police service center for purposes of his fact-finding investigation. He interviewed McField and Railey in a conference room. This interview was recorded, and the recording was played for the jury. During the interview, McField said he cared for the victim and Ka'Reysha on the day of the offense. His sister, Laquita Chambers, left the house at about 7:00 a.m. and did not return. McField said he was alone with the children all day, and no one else came to the apartment. Railey was at work throughout the day. She did not return to the apartment "until a little after 4 or a little bit after 4:30." Detective Meyer asked McField how the victim was injured. McField responded:

[Keanon] got problems about pee'ing on hisself. He don't go to the bathroom.

. . . .

And he get punished for it so I was whopping him so when I's whopping him he..[3] he had struggled, like well you know I can't even really hold him all that good. He'll run around the house and stuff so I can.. I caught him. I'm whopping him. I had took him throwed him on his bed but first I had him on my lap.

. . . .

He twisted his whole body down here.

. . . .

---

[3]The transcript designated pauses by putting two consecutive periods with no spaces.

Can't get ahold like that so I just took off, . . . I put him on the bed, folded his legs back and I was whopping him.

. . . .

And when I got.. when I got through whopping him he was struggling when I was doing that. I got through whopping him it was like I let his legs go, he was like.. his eyes was like rolling back.

. . . .

So you know what I'm saying, I'm like Keanon, I slapped him, I'm like Keanon wake up. He looked at me, woke up. He just got on up. I said come one, take a bath now cause he had pee'd all over hisself.

. . . .

So [I] wanted him to take his bath so I said come on let's walk. He started walking, he like fell so I pick him up. I took him upstairs. I put him in cold water.

. . . .

And so he.. he in the bathtub I'm like Keanon wake up, wake up and he woke up. I had the shower on first and I ran.. then I ran the bath water. He woke up and I said take a bath, okay. He said okay. Then I be.. I looked at him and he's taking a bath. He just laying in the water and he start messing with the water splashing it on his body so I got out and went downstairs to next door neighbor's house. I's talking to her for a minute and I came right back. Came back, asked Keanon you done, he was like yes sir so I was walking up the steps. I's coming up the steps, he stood up, you know, he was like, got ready to get out he just fell over the ..uh.. the tub part.

. . . .

But I don't know if he hit his head or not.

Near the conclusion of the interview, Detective Meyer asked McField how long he spoke to the neighbor, and McField replied, "not for very long."

Cynthia Jones, the victim's neighbor, testified that she was at home on the date of the offense. At around 9:30 a.m., Jones saw McField outside with his dog. They talked for between thirty minutes and an hour. Jones spoke with McField again at around 1:30 p.m. She said McField mentioned that the victim peed on the floor. McField also stated that "he whipped [the victim] and put him in the bathtub." Jones said McField claimed to have punished the victim by filling the bath tube with cold water. She did not see the victim on the day of the offense. On cross-examination, however, Jones said she spoke with McField from about 9:30 a.m. to 1:00 p.m. Jones stated, "I even sent him to the store for me." Jones testified that McField was not angry that day. She described him as being "fussy," which was not unusual.

Detective Mike Tilley of the Chattanooga Police Department testified that he was assigned to the Homicide Unit. At approximately 5:30 p.m. on the day of the offense, he was informed that the victim had been taken to the hospital. Detective Tilley went to the hospital to check on the victim's condition; however, the victim was pronounced dead at 5:58 p.m. Later that evening, Detective Tilley interviewed both McField and Railey. The interview with McField was recorded, and the recording was played for the jury.

The following is a summary of Detective Tilley's interview with McField. McField said he was left alone to care for the victim and his sister shortly after 7:00 a.m. During the day, he noticed that the victim's sister had urinated on herself. McField stated, "She know how to go to the bathroom so I whipped her." McField later determined that the victim had also urinated on himself, and the victim was whipped. When the victim tried to run away, McField hit him. McField stated:

> [H]e was like across . . . my legs, I tried to whop him but he like . . . turned his waist and turned sideways so I can't get to his butt so I put him on the bed. I folded his legs back and put weight on 'em and I started whopping his butt. He started struggling like he always do then when I got through . . . his eyes like rolled back in the back of his head.

McField placed the victim into the bathtub and ran cold water. The victim was active while in the bathtub. McField then left the apartment, spoke to the neighbor, and later returned to the apartment to check on the victim. He asked the victim if he was done with his bath, and the victim said yes. McField said the victim fell while trying to get out of the bathtub. McField was not sure if the victim had hit his head. The victim's eyes rolled back in his head. McField tried to wake the victim by shaking and slapping him. McField placed the victim on the bed and, because the victim squeezed his hand, McField thought the victim would be okay. McField left the room and later returned to discover that the victim was not breathing. McField attempted to perform CPR. He said Railey returned to the apartment and told him to call 911.

During the interview, McField described in detail the victim's fall out of the bathtub:

I'm going up the steps as he getting out I just see him fall over the . . . tub part . . . and he fell hard like he blacked out. I done blacked out before. He fell hard.

McField said that the victim's stomach area hit the top of the tub. He thought the victim also hit his head because his head went forward. McField picked up the victim and placed him on the bed. The victim was still breathing and McField checked on him every fifteen minutes. At some point, McField checked on the victim and discovered that he was not breathing. McField performed CPR for several minutes. He acknowledged that he did not immediately call 911 because he knew that the victim was dead. McField was also concerned about going to jail. McField said he was worried about jail because he was present when the victim died. McField stated that the victim was dead for about thirty minutes before Railey came home. Near the end of the interview, Detective Tilley asked McField why he did not call 911 after he first noticed that the victim was having problems. McField responded that he did not think that the problems were fatal.

On cross-examination, Detective Tilley acknowledged that he never interviewed Laquita Chambers or Jones. He did not investigate where the victim had been forty-eight hours prior to the offense. Detective Tilley said he did not investigate whether the victim hit his head on anything when he fell out of the tub.

Dr. James Metcalfe, a forensic pathologist for the Hamilton County Medical Examiner's Office and an expert in forensic pathology, testified that he performed the autopsy of the victim. Dr. Metcalfe determined that the cause of death was multiple blunt force injuries. He stated, "The pattern of injury is consistent with inflicted blunt force trauma." Dr. Metcalfe said the term "inflicted" means that the injury was caused by someone other than the victim and was not accidental. He testified that the victim suffered blunt force injuries to the chest, abdomen, and head. The victim had lacerations to his liver, lesser omentum, and spleen. The victim also had excessive blood around his abdomen, colon, and kidney. There was additional bruising to the back of the victim's abdomen, pancreas, small intestine, mesentery, kidney, lungs, mediastinum, pericardium, diaphragm, chest, back, thighs, and left upper arm. Dr. Metcalfe testified that the victim also suffered injuries to his head. There were contusions to the victim's scalp and brain, and blood had collected under the covering of his brain.

Dr. Metcalfe opined that the victim's bruises may have been caused by being struck with something with sharp edges, like a belt. Dr. Metcalfe did not think that the bruises on the victim's back and chest were accidental. Dr. Metcalfe did find some evidence of bruising on the victim's buttocks; however, he said the overall pattern of the bruising was not

consistent with spanking. He testified that the bruises to the abdomen and chest did not result from falling out of a bathtub.

Dr. Metcalfe explained that the victim's death was caused by internal injuries. The victim's liver had split and 500 milliliters of blood collected around the abdominal organs. Dr. Metcalfe said the liver injury was inflicted, and not accidental. He believed that the injuries to the abdominal area resulted from more than one blow. Dr. Metcalfe testified that the injury to the liver required "severe force" and was not consistent with spanking or falling over the side of a tub. He explained that the injuries to the victim's chest, lungs, and spleen were not caused by CPRV. Dr. Metcalfe said the injuries to the victim's brain resulted from at least two blows of "substantial force" which were potentially fatal. He believed that the victim bled to death over a period of thirty minutes to one hour. The victim would have been in a "good bit of pain" and was "[p]robably screaming and crying." Dr. Metcalfe did not think that the victim could have caused these injuries to himself. He estimated that the victim endured eighteen blows. Dr. Metcalfe concluded that the manner of death was a homicide.

On cross-examination, Dr. Metcalfe testified that he did not believe that the victim's injuries were caused by CPR, even if the CPR was performed by someone who was untrained. He said there was evidence of a prior hemorrhage in the lung area. Dr. Metcalfe believed that the victim would have died even if 911 had been called immediately after the injury was incurred.

After the State rested, the defense did not put on any additional proof. The jury convicted McField of first degree felony murder and aggravated child abuse.

**Sentencing**. The trial court began the sentencing hearing by addressing the sentence for first degree felony murder. It stated that McField would serve a life sentence with the possibility of parole. The remainder of the hearing dealt with the sentence for aggravated child abuse.

Officer James Rox testified that he prepared the presentence investigation report for the Tennessee Board of Probation and Parole. The report shows McField, age twenty-two, had prior convictions for unlawful possession of a weapon and violating the driver's license law. Officer Rox said he interviewed McField about his background. McField reported having a history of substance abuse, beginning at the age of eight. He claimed that as a child, he was beaten by his alcoholic mother. Officer Rox said McField had an eighth-grade education and was never employed. He received disability payments from 2003 to 2006 because of a mental disorder. McField reportedly had explosive anger disorder. He visited a hospital two days before the offense occurred, and he was prescribed Lithium.

Railey testified that she and her family were deeply affected by the victim's death. She was not aware that McField had a mental health disorder. Railey knew McField went to the hospital shortly before the offense and received medication.

Shirley Ann Wade, McField's mother, testified that McField had mental problems growing up. At the age of fourteen, McField was taken into the State's custody after a physical altercation. Wade regained custody when McField was seventeen. She said McField still suffered from explosive behavior disorder. He began taking medication for that disorder as a teenager.

Following the proof at the sentencing hearing, the trial court determined that McField was a Range I offender. The applicable sentencing range for aggravated child abuse, a Class A felony, was fifteen to twenty-five years. The trial court found that one mitigating factor was present under Tennessee Code Annotate section 40-35-113. It considered McField's tough childhood under mitigating factor (13), which serves as a catch-all provision. The trial court found that three enhancement factors were applicable under section 40-35-114. It considered McField's prior convictions, though it noted that he had no prior felonies. The trial court also determined, under enhancement factor (4), that the victim was particularly vulnerable because of his age. It stated:

> [Defense counsel] makes the argument that the offense itself requires someone to be under the age of eight, so that's considered, but I think the case law does point out that based upon the age, that this vulnerability factor can be considered, and I do find that to be true.

There's no specific proof presented of that, but the child was four years of age, he was there, he was too young to call for help, to make phone calls, he was under the care and control of Mr. McField, so I do find that he was particularly vulnerable because of his age and I find that's an enhancement factor.

Lastly, the trial court found that enhancement factor (14) was met because McField abused a position of private trust. It reasoned that McField was entrusted with the care of the four-year-old victim on multiple occasions. The trial court imposed a sentence of twenty years. McField filed a motion for new trial which was denied by the trial court. McField filed a timely notice of appeal.

**ANALYSIS**

**I. Motion to Suppress**. McField claims the trial court erred in denying his motion to suppress. He argues that his first statement[4] to Detective Meyer must be suppressed because it was made during a custodial interrogation without Miranda warnings. McField contends his second statement to Detective Tilley must also be suppressed because it was tainted by the first statement to Detective Meyer. He claims he did not voluntarily waive his Miranda rights before his interview with Detective Tilley. In response, the State argues that the trial court properly denied the motion to suppress. It contends the initial interview with Detective Meyer was a non-custodial interrogation, and therefore Miranda warnings were not required. It claims McField was not restrained of his liberty and that he gave the first statement on his own volition. The State argues that the second statement to Detective Tilley was properly admitted because it was given after McField knowingly and voluntarily waived his Miranda rights.

The courts of this state have concluded that "a trial court's determination at a suppression hearing is presumptively correct on appeal." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003) (citing State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986)). However, if the record on appeal preponderates against the trial court's determination, then the presumption of correctness may be overcome. Harbison, 704 S.W.2d at 318 (citing Mitchell v. State, 458 S.W.2d 630, 632 (Tenn. Crim. App. 1970)). The Tennessee Supreme Court explained this standard in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

**A. First Statement to Detective Meyer**. We will first address whether the trial court erred by admitting McField's first statement to Detective Meyer. At the suppression hearing, Detective Meyer acknowledged that he did not inform McField of his Miranda rights during their interview. A police officer is required to warn a suspect of his Miranda rights prior to a custodial interrogation. See Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); State v. Riels, 216 S.W.3d 737, 754 (Tenn. 2007). The Tennessee Supreme Court has stated, "The warnings and waiver mandated by Miranda 'are, in the absence of a fully effective

---

[4]For purposes of clarity, we will refer to McField's initial interview with Detective Meyer as the first statement. McField's later interview with Detective Tilley will be referred to as the second statement.

equivalent, prerequisites to the admissibility of any statement made by a defendant' during custodial interrogation, whether inculpatory or exculpatory." State v. Northern, 262 S.W.3d 741, 749 (Tenn. 2008) (quoting Miranda, 384 U.S. at 476). Therefore, the admissibility of McField's first statement is dependant on whether the interview with Detective Meyer was a custodial interrogation.

The Tennessee Supreme Court has set forth the following standard for determining whether a suspect is in custody: "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996); see also Riels, 216 S.W.3d at 754; State v. Payne, 149 S.W.3d 20, 32 (Tenn. 2004). In Anderson, the court made clear that "courts must consider the totality of the objective circumstances surrounding the interrogation, 'not the subjective views harbored by either the interrogating officers or the person being questioned.'" Anderson, 937 S.W.2d at 854 (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). The court emphasized the following passage from the United States Supreme Court's decision in Stansbury:

> [A]n officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

Id. (quoting Stansbury, 511 U.S. at 325).

In Anderson, the court provided the following, non-exclusive list of factors to consider when deciding whether a person is in custody:

> [T]he time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware

that he or she is free to refrain from answering questions or to end the interview at will.

Id. at 855 (internal citations omitted). The court described the evaluation of the relevant factors as "a very fact specific inquiry." Id. It added, "Application of the appropriate, relevant factors to the facts is a task for which the trial court is especially suited." Id.

In this case, the trial court determined that the initial interview between McField and Detective Meyer was a non-custodial interrogation. It found that a reasonable person in McField's position would believe that he or she was free to leave the interview. The trial court stressed that Detective Meyer's questions were not accusatory in nature and merely sought to discern what happened to the victim. The trial court emphasized that McField was forthcoming with his responses. It stated, "McField freely talked about what he had done that day." The trial court also referred to the short duration of the interview, the friendly interaction between Detective Meyer and McField, and the fact that the interview took place in a conference room, rather than a regular detective office.

Before reviewing the trial court's findings, we again note that the record does not contain the motion to suppress or the trial court's written order. McField was responsible for providing a record that conveys a fair, accurate, and complete account of what transpired with regard to his motion. See T.R.A.P. 24(b); State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). Ordinarily, McField's failure to present a complete record on appeal would result in a waiver of this issue. See State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993). However, the transcript contains a detailed account of the trial court's findings, which permits our review of this issue. Although a motion to suppress is required to be filed pretrial, see Tenn. R. Crim. P 12(b)(2)(c), it is apparent from the record that such a motion was filed.

In viewing the transcript of the suppression hearing, several factors support the trial court's decision. The duration of the interview was less than nine minutes. Detective Meyer was the only officer present, and he was not armed. McField was not handcuffed or shackled during the interview. Detective Meyer was cordial in dealing with McField and Railey. Detective Meyer explained the purpose of the interview, and stated, "Look, we don't know what's going on and what happened but, you know, we have to find out and that's why I asked them to bring you out here, okay." In questioning McField, Detective Meyer tried to ascertain how the victim was injured. The primary purpose of the interrogation was not to obtain an incriminating statement from McField. Detective Meyer did not ask specific questions about the critical aspects of McField's testimony; namely, his use of corporal punishment or the victim's fall in the bathtub. Detective Meyer simply allowed McField to provide his explanation for how the victim was injured. In listening to the recording of the interview, McField was not hesitant in providing his account of what transpired.

However, in our view, more of the factors support a finding that the interview was a custodial interrogation. The interview occurred soon after an ambulance took the victim to the hospital. McField and Railey were not permitted to go to the hospital; rather, they were brought directly to the Major Investigations office by a patrol unit. Detective Meyer testified that at the time of the interview, McField and Railey did not know whether the victim had been pronounced dead. Detective Meyer acknowledged that he never informed McField that he could refuse to answer questions or that he could end the interview. Additionally, when Detective Meyer stopped the interview, he did not tell McField that he was free to leave. McField was told that he could wait in the conference room and watch television. At the suppression hearing, McField said he felt obligated to go to the police service center. He also thought he was required to stay at the police service center.

In weighing the foregoing factors, we conclude that the evidence preponderates against the trial court's determination. In our view, McField's initial interview with Detective Meyer amounted to a custodial interrogation. Our primary consideration is the extreme circumstances under which the interview was conducted. McField and Railey were brought to the police service center by a patrol unit shortly after Railey's four-year-old child was transported to the hospital. They were not informed that they could refuse to answer questions or end the interview. Detective Meyer never informed McField and Railey that they could go to the hospital to find out whether the victim was alive. Under these circumstances, a reasonable person would have considered "himself or herself deprived of freedom of movement to a degree associated with a formal arrest." Anderson, 937 S.W.2d at 855. We see particular significance in the fact that after Detective Meyer stopped the interview, he told McField and Railey that they could watch television while they waited in the conference room. This statement conveys an expectation that they would stay at the police service center rather than go to the hospital to check on the victim's condition. We recognize the factors supporting the trial court's decision that are outlined above. In particular, we acknowledge that McField never made a request to leave the police service center or go to the hospital. We hold, however, that McField's first statement to Detective Meyer was made during a custodial interrogation. Because he was not informed of his Miranda rights, his first statement should have been ruled inadmissible. We will address whether the admission of this statement constituted harmless error after analyzing McField's second statement to Detective Tilley.

**B.  Statement to Detective Tilley**.  McField claims the trial court also should have suppressed his statement to Detective Tilley. This statement was made after McField executed a written waiver of his Miranda rights. McField contends that despite the waiver, his second statement was not knowingly and voluntarily given because it was tainted by his first statement to Detective Meyer.

The Tennessee Supreme Court has stated, "When <u>Miranda</u> warnings are given and a waiver obtained, the prosecution has 'a virtual ticket of admissibility' for any resulting custodial statement of the defendant." <u>Northern</u>, 262 S.W.3d at 749 (quoting <u>Missouri v. Seibert</u>, 542 U.S. 600, 608-09 (2004)). In <u>State v. Smith</u>, the court recognized an exception to this general principle for situations in which a custodial statement is preceded by an illegally-obtained confession. <u>State v. Smith</u>, 834 S.W.2d 915, 919 (Tenn. 1992). The court created a rebuttable presumption that an illegally-obtained confession tainted a subsequent confession, even if the subsequent confession was preceded by proper <u>Miranda</u> warnings. <u>Id.</u>; <u>see also</u> <u>Northern</u>, 262 S.W.3d at 763 (applying <u>Smith</u>). In order to overcome this presumption, the State must show "'that the taint is so attenuated as to justify admission of the subsequent confession.'" <u>Smith</u>, 834 S.W.2d at 919 (quoting <u>Oregon v. Elstad</u>, 470 U.S. 298, 335 (1985) (Brennan, J., dissenting)).

In <u>Smith</u>, the court defined the "critical inquiry" as:

[W]hether the events and circumstances surrounding and following the initial, illegal conduct of the law enforcement officers prevented the accused from subsequently (1) making a free and informed choice to waive the State constitutional right not to provide evidence against one's self, and (2) voluntarily confessing his involvement in the crime.

<u>Id.</u> The court provided a non-exclusive list of factors to consider in making this determination:

1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;

2. The temporal proximity of the prior and subsequent confessions;

3. The reading and explanation of <u>Miranda</u> rights to the defendant before the subsequent confession;

4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;

5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;

-17-

6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;

7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;

8. Whether the defendant initiated the conversation that led to the subsequent confession; and

9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered Miranda rights.

Id. at 919-20.

At the outset, we acknowledge the factors that weigh in favor of finding that the statement to Detective Tilley was involuntary. Specifically, in considering factor four, the circumstances preceding McField's second statement, we note that McField was brought directly to the Major Investigations office where he remained for several hours. He stayed at the office in the period between interviews. During this time, McField learned that the victim was officially pronounced dead. McField was not provided food while at the police service center. Additionally, under factor eight, McField did not initiate the conversation that led to his second statement.

However, in our view, the following factors outweigh the above factors and support a finding that McField's second statement to Detective Tilley was given knowingly and voluntarily. Under factor one, neither of the detectives were coercive in dealing with McField. Although the first statement was obtained illegally, Detective Meyer was not accusatory in dealing with McField. McField concedes in his brief that Detective Meyer "was cordial to him." Regarding factor two, Detective Tilley estimated that he interviewed McField three hours after the initial interview with Detective Meyer. For factor three, Detective Tilley informed McField of his Miranda rights at the start of the interview. McField acknowledged that he understood these rights. The record includes the "Rights Waiver Form," which was signed by McField. McField marked that he could read and write, and he wrote his initials next to each of his constitutional rights. Under factor five, the atmosphere of the interview was not coercive. The detectives were professional, and McField was forthcoming with his explanation of what happened to the victim. After listening to the forty-two (42) minute tape-recording of the interview, it is clear that McField wanted to explain what happened to the victim to the officers. Regarding factor six, there

was no evidence that McField was denied the opportunity to consult with counsel or family members. For factor seven, there was no indication that McField was affected psychologically by his first statement to Detective Meyer. The effect of the first statement is certainly depreciated by the fact that McField arguably did not admit to committing an offense. Regarding factor nine, the evidence failed to show that McField lacked the ability to understand the administered Miranda rights. McField was literate and had an eighth-grade education. He also had some experience with the law based on two prior convictions and six other dismissed or withheld charges.

In considering the foregoing factors, the trial court did not err by admitting McField's statement to Detective Tilley. Nearly all of the factors support the conclusion that McField made a free and informed choice to waive his Miranda rights. The evidence rebuts the presumption that the second statement to Detective Tilley was tainted by the first statement to Detective Meyer.

Because we previously held that the trial court erred by admitting the first statement to Detective Meyer, we must review whether the error was harmless beyond reasonable doubt. The harmless error doctrine applies to the admission of involuntary confessions. Arizona v. Fulminante, 499 U.S. 279, 310 (1991); State v. Koffman, 207 S.W.3d 309, 320 (Tenn. Crim. App. 2006). In applying this doctrine, the Tennessee Supreme Court has stated that "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008). The court added, "Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless." Id. (citing Kotteakos v. U.S., 328 U.S. 750, 776 (1946)). Here, the admission of the initial statement was harmless for two reasons. First, McField does not admit in the statement that he committed an offense. McField acknowledged that he was alone with the victim throughout the day, and that he used corporeal punishment. He did not state, however, that he committed acts that would have caused the injuries described by the medical examiner, Dr. Metcalfe. McField provided an exculpatory explanation for the injuries to the victim's head and abdominal area by stating the victim fell in the bathtub. Second, the error was harmless because any incriminating aspects of the first statement were addressed in significantly greater detail in the second statement to Detective Tilley. Based on these two reasons, the admission of the initial statement to Detective Meyer was harmless beyond a reasonable doubt. McField is not entitled to relief on this issue.

**II. Sufficiency of the Evidence**. McField does not address the felony murder conviction and limits his insufficiency of the evidence claim to his aggravated child abuse conviction. He argues that the State failed to prove that the victim's injures were not caused by accidental means. McField contends the evidence merely showed that he used an acceptable level of corporeal punishment. In response, the State argues that a rational juror

could have found that the elements of the offense were met. The State claims the testimony of Dr. Metcalfe established that McField knowingly injured the victim. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). Recently, the Tennessee Supreme Court adopted the United States Supreme Court standard that direct and circumstantial evidence should be treated the same when reviewing the sufficiency of the evidence. See State v. Genaro Dorantes, No. M2007-01918-SC-R11-CD, 2011 WL 208306, at *12 (Tenn. 2011). Finally, the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. Odom, 928 S.W.2d at 23.

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

McField was convicted of aggravated child abuse, the Class A felony. Child abuse requires proving that the defendant "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." T.C.A. § 39-15-401(a) (2009). The child abuse is aggravated if it "results in serious bodily injury to the child." Id. § 39-15-402(a)(1). The aggravated child abuse qualifies as a Class A felony if the victim is eight years of age or less. Id. § 39-15-402(b).

Here, McField argues that the victim's fatal injuries were accidental and a result of corporal punishment. However, the record shows that at the time of the four-year-old victim's death, McField "whopp[ed]" the victim until the victim's "eyes rolled back into [the victim's] head." Although McField may not have intended to kill the victim, there was overwhelming proof from the medical examiner that McField's actions caused the victim's death. The medical examiner repeatedly testified that the victim's injuries were "inflicted" and not accidental. The victim suffered multiple blunt force injuries to his chest, abdomen, and head. Significantly, the victim's liver had been split as a result of multiple blows. The medical examiner estimated that the victim bled to death over a period of thirty-minutes to an hour. Finally, the victim's brain was also impacted by "two blows" of "substantial force" which were potentially fatal. In total, the four-year-old victim endured eighteen "blows" to his body. The jury heard McField's account of what happened to the victim and rejected it. We will not second-guess or override their decision. Based on this evidence, we conclude that a reasonable jury could have found McField guilty of aggravated child abuse beyond a reasonable doubt. He is not entitled to relief on this issue.

**III. Photograph**. McField claims the trial court erred by admitting a photograph of the victim's cranium. He contends the photograph lacked probative value because the medical examiner testified that the injuries to the victim's head were not the cause of death. McField also argues that the photograph was overly prejudicial. He asserts, "The testimony of [the medical examiner] was descriptive enough to convey this information to the jury without enflaming [sic] and prejudicing them with this photograph. Moreover, the picture is gruesome in nature and any probative value it might have is substantially outweighed by the prejudicial effects." In response, the State argues that the photograph was relevant because it supplemented the medical examiner's testimony about the injuries to the victim's head. The State contends that the photograph was not gruesome or prejudicial. Upon review, we hold that the trial court did not err by admitting the photograph.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951). However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted. See Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as

"an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

Here, prior to the medical examiner's testimony, the trial court held a bench conference and determined that the photograph was admissible. The photograph showed the back of the victim's scalp after his skin was removed. Two areas of the victim's head were covered with blood. The trial court determined that the photograph was relevant because it revealed the location and degree of the victim's injuries. It found that the photograph was not unduly prejudicial. The trial court reasoned that the photograph was not overly graphic for an autopsy photograph. The photograph, an exhibit during the medical examiner's testimony, was part of a slide showing the victim's internal injuries. The medical examiner testified at length about the injuries to the victim's head. The medical examiner stated that the injuries to the victim's head were inflicted and were not caused by a fall.

Upon review, the trial court properly found that the photograph was admissible. It was adequately verified and authenticated. Under Rule 401 of the Tennessee Rules of Evidence, the photograph was relevant to whether the victim suffered serious bodily injury. See T.C.A. § 39-15-402(a)(1). The photograph showed the accumulation of blood at two points on the back of the victim's head. Under Rule 403, the probative value of the photograph was high considering the importance of the medical examiner's testimony. The photograph corroborated the medical examiner's testimony that the victim suffered significant internal injuries to his head. The photograph was of particular importance because the medical examiner explained that the location of the head injuries suggested that the head injuries were not caused by a fall. We note that the value of the photograph was not dependent on whether the head injuries caused the victim's death. The charge of felony murder required proving the elements of aggravated child abuse. In considering the danger of unfair prejudice, we recognize that the photograph was graphic. We cannot conclude, however, that the graphic nature of the photograph substantially outweighed its high probative value.

McField claims this case is analogous to Gladson v. State, 577 S.W.2d 686 (Tenn. Crim. App. 1978), in which this court found that the admission of two autopsy photographs warranted a new trial. Id. at 687. One of the photographs in Gladson showed the deceased's cranial bones after the removal of his hair. Id. The present case is distinguishable from Gladson because McField did not concede the cause of the victim's injuries. Id. The defendant in Gladson offered to stipulate that the victim died as a result of injuries suffered during an altercation with the defendant. Id. In the instant case, the cause of the victim's injuries was a contested issue at trial. McField's claim is without merit.

**IV. Sentencing**. McField claims his sentence for aggravated child abuse was excessive because the trial court misapplied enhancement factor (4), which addresses the vulnerability of the victim based on age or disability. T.C.A. § 40-35-114(4) (2007). McField contends the vulnerability of the victim is included within the elements of aggravated child abuse. He asserts that the victim's ability to seek help is addressed by the requirement that the victim suffered serious bodily injury. The State contends the trial court properly found that enhancement factor (4) was applicable because the victim's vulnerability was not an element of aggravated child abuse.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Our review is de novo, without a presumption of correctness, if the trial court applied inappropriate mitigating or enhancement factors or otherwise failed to follow the principles of the Sentencing Act. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). The defendant, not the State, has the burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d) (2006), Sentencing Commission Comments.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See T.C.A. § 40-35-210(b); see also State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002); State v. Osborne, 251 S.W.3d 1, 24 (Tenn. Crim. App. 2007).

The Tennessee Supreme Court has stated that the 2005 Amendments to the Sentencing Act "deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." Carter, 254 S.W.3d at 344. In sentencing a defendant, the trial court must consider the sentencing guideline that suggests an adjustment to the defendant's sentence when enhancement or mitigating factors are present; however, these factors under the guideline are merely advisory rather than binding upon a trial court's sentencing decision. Id.; see also T.C.A. § 40-35-210 (2006). The weight given to each enhancement or mitigating factor is left to the sound discretion of the trial court. Id. Thus,

this court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Here, the trial court imposed a twenty-year sentence for aggravated child abuse. As a Range I offender, the applicable sentencing range was fifteen to twenty-five years. T.C.A. §§ 39-15-402(b), 40-35-112(a)(1). The trial court found that one mitigating factor was present under Tennessee Code Annotate section 40-35-113. It considered McField's tough childhood under the catch-all provision of mitigating factor (13). The trial court determined that three enhancement factors were applicable under section 40-35-114. It found that enhancement factor (1) applied because McField had prior convictions for unlawful possession of a weapon and violating a driver's license law. The trial court also determined that enhancement factor (14) was met because McField abused a position of private trust.

At issue is the trial court's determination that enhancement factor (4) was applicable. This enhancement factor is whether: "A victim of the offense was particularly vulnerable because of age or physical or mental disability." T.C.A. § 40-35-114(4). The trial court acknowledged that the convicted offense already accounted for the age of the victim. Nonetheless, it stated, "I think the case law does point out that based upon the age, that this vulnerability factor can be considered, and I do find that to be true." The trial court found that the victim was particularly vulnerable because he was under McField's care and control and was too young to call for help.

This court has found that even though the victim's age is an element of aggravated child abuse, the trial court can apply enhancement factor (4) under certain circumstances. See State v. Eric Cathey, No. W2008-01446-CCA-R3-CD, 2010 WL 2836632, at *20 (Tenn. Crim. App., at Jackson, July 20, 2010); State v. Blake Delaney Tallant, No. E2006-02273-CCA-R3-CD, 2008 WL 115818, at *32 (Tenn. Crim. App., at Knoxville, Jan. 14, 2008). The trial court has to "consider whether evidence in the record with regard to the victim's age or physical and mental attributes demonstrated an inability to resist the crime, summon help, or testify at a later date." State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997); see also State v. Adams, 864 S.W.2d 31, 35 (Tenn.1993). The victim's vulnerability must have "some bearing on, or some logical connection to, 'an inability to resist the crime, summon help, or testify at a later date.'" State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001) (quoting Poole, 945 S.W.2d at 96). The State is required to present evidence of the victim's vulnerability, in addition to the victim's age; however, this evidence "'need not be extensive.'" Id. (quoting Poole, 945 S.W.2d at 97). The State is not required to prove that the defendant "actually evaluated the vulnerabilities of his victims and then acted to capitalize on those perceived vulnerabilities." Id.

Here, the record shows that McField folded the four-year-old victim's legs back and put his weight on him to prevent the victim from getting away. McField "whopped" the victim and the victim's eyes "rolled back in the back of [the victim's] head." At this point, McField was concerned about the victim's condition, but chose to leave the victim unattended and did not render any aid. As noted by the trial court, the victim was essentially alone with McField and under McField's control. The victim clearly lacked the physical maturity to defend himself and the means to summon help. Under these circumstances, we conclude that the trial court properly applied enhancement factor (4) in sentencing McField. McField is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE